BLOOMFIELD *v.* MALONEY.

1. CONTRACTS—OFFER AND ACCEPTANCE—REWARDS.
    An advertisement offering a reward of $1,000 "for the arrest and conviction" of a criminal, is to be construed not literally but substantially, so that persons who give in-

formation leading to the arrest of the offender and resulting in his conviction by a court of competent jurisdiction are entitled to the fund.[1]

2. SAME.

Where one of the defendants, in an interpleader suit for the purpose of securing a reward offered, informed the officers that she knew the name of the offender, and gave such information that the officer, with the aid of facts furnished by two other defendants, succeeded in identifying him and caused his arrest, whereupon he pleaded guilty, the defendants were entitled to have the reward divided among them in the proportions justified by the value of their services: one-half to the first informant, the other half to be equally divided between the other defendants.

Appeal from Jackson; Parkinson, J. Submitted June 11, 1913. (Docket No. 74.) Decided July 18, 1913.

Bill by Charles C. Bloomfield against W. Frank Maloney, Clara McKain, and Edward Kurtz for a decree of interpleader. From a decree awarding the fund to defendants Kurtz and Maloney, said McKain appeals. Reversed.

*Wilson & Cobb,* for complainant.

*Fellows & Chandler,* for defendant and appellant.

*Price & Whiting,* for defendants and appellees.

STONE, J. This is a bill of interpleader. The complainant, on or about January 14, 1910, received a letter purporting to have been written by a member of a "Black Hand" society of Chicago, Ill., stating that if complainant did not leave a large sum of money at a place therein named in the city of Jackson, on the night of the 20th day of January, 1910, he would be killed. In order to apprehend the writer of the letter, or effect the capture of the person calling for

[1] On the question what must be done in order to earn reward for arrest, see note in 7 L. R. A. (N. S.) 216.

the package of money, complainant placed a decoy package at the place designated, and had it watched by officers. During the evening some person, then unknown to complainant, came and took possession of the package and made his escape. On January 21, 1910, complainant caused a reward of $1,000 to be offered for the arrest and conviction of the writer of such threatening letter. On the same day one Ray Horsman was arrested and charged with the crime of sending such threatening letter to complainant, and on February 4, 1910, said Horsman pleaded guilty in the circuit court to an information charging him with said offense, and was sentenced to a term of imprisonment. Thereafter the defendants Maloney and Kurtz claimed that they furnished information that led to the arrest and conviction of Horsman, and that they were each entitled to one-half of said reward, to recover which they commenced an action at law against complainant in the circuit court. A like claim was made by defendant Clara McKain for all such reward, and a like action was by her commenced. Complainant represented by his bill that he had always been willing to pay the amount of such reward to such person or persons as should be lawfully entitled to the same, and he offered to bring the money into court. The bill complied with the practice by proper averments, and prayed that defendants interplead and settle and adjust their said demands between themselves. The money was paid into court, and the suits at law were restrained.

The answers of the several defendants admitted the offering of the reward as alleged in the bill, and each claimed the fund. A decree was duly entered, to the effect that the bill of interpleader was properly filed, and that the several answers should be taken as and for an interpleader between defendants, and as statements of their respective claims. Upon the final hearing the entire reward was decreed to the

two defendants Maloney and Kurtz, with costs against the defendant Clara McKain, and she has appealed.

Upon the hearing it appeared that the police made an unsuccessful attempt to arrest the person who tried to get the package, about 10 o'clock on the evening of January 20th, but he got away, and ran up the street; the officers shooting at him. He ran into an alley in the rear of the Athenaeum theater and escaped. Defendant Maloney and the son of defendant McKain attended a show at the Athenaeum on the evening in question, and sat together. Maloney had gone down on the street between acts, and while there the man pursued by the officers passed him, and Maloney testified that he recognized the man as Ray Horsman. Upon his return to the gallery he had talked the matter over with Mrs. McKain's son, and had related what he saw. Maloney testified as follows:

"When I returned I said to him, 'You ought to have been down there and seen the fun;' he says, 'What's the matter?' I says, 'I don't know.' I says, 'There are two or three fellows after young Horsman;' he says, 'What Horsman?' I says, 'Young Ray Horsman.' Neither of us could figure it out what it was. I told him what I saw, but we couldn't tell what was the matter."

Upon that point Mrs. McKain's son testified:

"When they came up Maloney sat next to me and said there was something doing downstairs; said he saw a couple of men chasing some one else and they ran by him, and as they went by he got a glimpse of them, and the one pursued he said was 'a dead ringer' for Ray Horsman."

Neither Maloney nor young McKain at this time knew anything of the "Black Hand" letter. The whole matter appeared in the next morning's newspaper, with a description of the attempted capture, the escape, and the offer of reward. Mrs. McKain saw this offer of reward about half past 6 on the

morning of January 21st. Her attention was called to it by her son. He testified:

"I got up a little after 6 and got the paper off the porch; mother was getting breakfast, and that of course was the first thing I read; big scare lines on the first page of the Jackson Patriot; I read that, the gist of it. The first thing I saw was about the reward; it was in the head lines, $1,000 reward. I said, 'I bet I can name the party.' Read the description; it fitted Horsman to a T. I said I think I knew who it was, and mother said, 'Do you?' 'I will call up Strobel and get the reward.' I said 'No, you better not, better keep out of it; I don't want to mix up in the affair and get up in court, one thing and another.' She called Strobel up and talked with him as I was leaving the house, and I think she said he was coming up there to get all the information she had."

Upon this subject Mrs. McKain testified as follows:

"I saw the morning Patriot at 6:30 in the morning of January 21st; my son read it to me, and later I saw it. He read it aloud; after he had read it he told me what he had heard at the Athenaeum the night before; what Mr. Maloney told him; said Mr. Maloney told him it was a 'dead ringer' for Ray Horsman; after this article had been read, and after this talk with my son, I called up Chief Strobel; my son had in his talk told me of Mr. Maloney being downstairs and seeing this man, and that he was most positive that it was Ray Horsman. I asked Chief Strobel if since the paper had gone to press he had found the 'Black Hand' man, and he said that he hadn't; that he hadn't any clue; I told him I could tell him who it was, and I did tell him; I told him it was Ray Horsman. He kind of doubted it. * * * He says, 'I will come over to your house,' and he dropped the phone at that and did come over. * * * He says, 'If you can tell me, Mrs. McKain, you can get $1,000; I will give you $1,000.' I supposed he had the handling of the $1,000. I called him up simply to get the reward. * * * I think he came there about a quarter after 7. * * * While Mr. Strobel was there I called up my son at his request; he wanted to know if he was at the foot of the stairs, or if he was in the gallery;

I called him up to find out; after I had talked with Mr. Strobel, he said, 'You have convinced me.' "

She further testified that when Mr. Strobel was leaving, she might have told him to go and see Frank Maloney.

Upon this subject Mr. Strobel, chief of police, testified as follows:

"The morning of January 21st I received a telephone call from Mrs. McKain. I should judge somewhere between 6 and 7 o'clock, and we talked.   *   *   *   She told me then, or down at the house, I had better look up Ray Horsman, or words to that effect.   *   *   *   I went to Mrs. McKain's house on Mason street, and had a talk with her there, and she related to me what her son Earl had told her about the affair; said Earl, as I remember it, was at the Athenaeum that night. She called him up; he had gone to work; she called him up and talked with him, and I asked Mrs. McKain whether Earl was sure it was Ray Horsman; she said, 'Why, yes,' she thought so. She says: 'Go and see Frank Maloney; he knows all about it.' I was not acquainted with Mr. Maloney; had seen him, but had no acquaintance; had been in his father's store; I knew where he was located."

The witness further testified: That the information which he received from Mrs. McKain was the first information received connecting Horsman with the black hand transactions; that she suggested that he see W. Frank Maloney, defendant. Pursuant to that suggestion witness went to Maloney's store. When he got to the store he found defendant Maloney, his father, and defendant Kurtz. The two defendants Maloney and Kurtz were sitting together. That witness said to Frank Maloney,

"I understand you were out back of the Athenaeum last night when a couple of my officers were chasing a man."

Witness told Maloney that he wanted to know what he saw there, and the latter went on and told witness that he was outside, standing on the walk on Wash-

ington street, somewhere near the stage entrance, near the end, and said he heard some shots fired, and pretty soon there was a man turned the corner by the post office and cut diagonally across the rear end of the Athenaeum, where he was standing, and ran around in the rear of the theater. Maloney said that just then there were several officers chasing the party around the corner of the post office.

"Maloney turned to Mr. Kurtz, and says: 'I have told my story; you tell your story.'"

That defendant Kurtz went on and told witness that along about 10 o'clock a fellow came into the drug store where he worked and said: "Hide me, hide me." That Kurtz asked the party what was the matter, and he replied, "Never mind, show me a place to hide." That Kurtz told him to go into the back room, which he did, and a short time thereafter came out and wanted to borrow Kurtz' overcoat, which he loaned him, and about an hour or so afterwards he brought the overcoat back. Witness testified that he then asked, "Who is that man," and Kurtz said, "Ray Horsman." It was the witness' recollection that Kurtz first gave the name, but that both Kurtz and Maloney gave the name at the same time, and both agreed that the party was Ray Horsman. Soon after this interview with Maloney and Kurtz, witness arrested Horsman, and his confession and conviction followed. The witness further testified, in answer to a question, as follows:

"*Q.* When you did come from Maloney's store to the dry goods store where Horsman was employed and made his arrest, you were relying upon the information obtained from Maloney and Kurtz? That is true, isn't it?

"*A.* Yes; of course they were talking from what they personally saw—the other was hearsay; I don't know as I stopped—I took all the information I had. I probably didn't stop to think of that. I wouldn't be

justified in arresting a man on hearsay, I don't suppose. * * * They told me their story mostly without asking a question, and there was no hesitancy when I asked who it was. When I went there I was keen on the scent, and anxious to find out just what the facts were; I lost no time in telling my errand there and asking what they knew, and as they were telling it along I asked such questions as.I saw fit. * * *

"*Q.* I suppose by the time he got that far with his story you had become so convinced you had the right man you didn't wait to get the details of what he said about the black hand letters; you thought you would get that later; you were anxious to get away and arrest Horsman?

"*A.* Certainly; I didn't expect to spend any more time than I had to." ·

The defendant Kurtz testified, in substance: That he had known Ray Horsman for some years, simply knew him to speak to him as he came into the store where witness worked; that about 10 o'clock of the evening of January 20th, while witness was in the front part of the store, and while it was raining, Horsman came running down the alley, and came running in the front door and said: "Ed., for God's sake hide me." Witness said, "What for?" "He said, 'Hide me.'" "I says, 'Go into the back room.'" He did go into the back room and stayed there about five minutes. Finally he came out and asked to borrow witness' overcoat, and promised to bring it back before the store closed, after the play. He borrowed the coat, and as he was going out witness said: "Ray, what does this mean, what is the excitement?" He said, "I can't tell you about it," and went out the front door. After the play was over Horsman brought the coat back and sat down at the soda counter and had a glass of ginger ale. Witness then said to him: "Ray, what does this mean, what is the occasion of your running in this way?"

He said:

"I will tell you. About two weeks ago I received a letter from Chicago telling me I should go to this place, * * * and get this package on Thursday night, January 20th, and on Friday night take it out on the corner of E. Main and Gorham street and throw it in between two stores."

Witness said, "Ray, I think it is a joke." Horsman said,

"Well, no, I don't, because I got another letter Tuesday telling me not to forget Thursday night, January 20th, at 10 o'clock."

Witness said,

"I think it is a joke all the way through, somebody has been putting over something on you."

He said:

"I don't know. Don't say anything about it, will you, to any one?"

Witness asked Horsman if he got the package, and he said, "Yes, but during the shooting it scared me so I dropped the package," and he stated that he had been shot at. The witness further testified that after Horsman had gone out of the store defendant Frank Maloney came in, and that he and witness talked about the matter, neither of them at that time knowing anything about the black hand letter, except what may have been told Kurtz by Horsman. The witness told Maloney that "the fellow came in here." Maloney asked, "Who was it?" Witness said, "Ray Horsman." That the next morning Maloney called the witness on the telephone as witness was dressing, and after witness was dressed he went down to Maloney's store, and Maloney asked him, "Did you know about the shooting?" And the witness replied, "Yes, what I know about last night;" and Maloney said, "Look at the paper." That while glancing over the headlines of the paper Chief Strobel came in, and a little afterwards Lieutenant Hudson. That just

before Strobel came in. Maloney said to the witness, "We better go over to the station."

Defendant Maloney corroborated defendant Kurtz in his testimony, and, after testifying that he saw the paper on the morning of the 21st, and after he got down to the store he called up defendant Kurtz about 8 :15 or 8 :20 a. m., and that soon Mr. Kurtz came in, that Maloney showed him the paper and they were reading it over, and that it was their intention to go directly down to the station, to police headquarters, and tell what they knew about it, and that just about that time Chief Strobel and Lieutenant Hudson came in.

We have given somewhat in detail the evidence here to show the circumstances surrounding the transaction, as stated by the several witnesses.

It is the claim of the appellant that, she, having communicated the first information to the officer, is entitled to the whole of the reward, and that the money should be paid to the person who first communicated the information that ultimately led to the arrest and conviction; that it is not necessary, in order to entitle her to recover the entire reward, that she possessed or communicated facts sufficient to warrant an arrest and conviction, but that the meritorious question is: Who communicated the information that started the inquiry which led to the result obtained? On the other hand, it is the claim of the appellees that the mere communication of suspicions as to the guilt of a person whose arrest and conviction are secured by other evidence is not compliance with the terms of the offer.

Under the pleadings, we have treated this case as one where the reward was offered for the arrest and conviction of the offender. It is the claim of appellees that the service contemplated, by a person making such an offer, and which the proposal should be construed as meaning, must be the obtaining and giving

to some proper person interested sufficient information in relation to the perpetrator of the crime as to authorize and secure the arrest of the offender, and subsequently to secure his conviction by a court of competent jurisdiction. And, as the communication of appellant to the officer was merely the communication of suspicions which of themselves did not induce the officer to make the arrest, that appellant is not entitled to any portion of the reward; that a reward for an arrest is not rendered by information which has to be supplemented by investigation by others.

We have examined many of the reported cases upon this subject, as well as text-books, and find it difficult to reconcile all of the authorities. A leading case upon the subject is that of *Haskell* v. *Davidson*, 91 Me. 488 (40 Atl. 330, 42 L. R. A. 155, 64 Am. St. Rep. 254). In that case the defendant was one of 30 citizens who agreed to pay a certain sum each as the reward for the arrest and conviction of a person, or persons, who had entered the room of one Wilson and stolen money therefrom. The plaintiffs were informed of this offer, and were thereby induced to enter upon an investigation of the crime referred to, as a result of which facts and circumstances were discovered by them tending strongly to inculpate one Thompson, who, upon being confronted with the charge by plaintiffs, made a full confession of his guilt, and subsequently pleaded guilty to the indictment found against him. The court there said:

"An offer of reward is a proposal. The party making it may insert his own terms, and no person can become entitled to the reward without a performance of all the terms contained in the proposal. But such performance need not be a literal compliance with the terms of the offer. It is sufficient, if the party claiming the reward has substantially performed the service required by the proposal.

"An offer of a reward for 'the arrest and convic-

tion' of an offender cannot be taken literally. The person who by reason of the offer is induced to make an investigation and finally obtains possession of sufficient facts to authorize the arrest of an offender and his subsequent conviction for the crime referred to in the offer, certainly cannot himself convict the offender. The service contemplated by a person making such an offer, and which the proposal should be construed as meaning, must be, the obtaining and giving to some proper person interested, sufficient information in relation to the perpetrator of the crime and his whereabouts as to authorize and secure the arrest of the offender, and subsequently to procure his conviction by a court of competent jurisdiction.

"In *Crawshaw* v. *Roxbury*, 7 Gray [Mass.], 374, the offer was 'for the apprehension and conviction.' The court at *nisi prius* instructed the jury, in regard to the service to be performed to entitle the plaintiff to a reward, that the offer of a reward could not be taken literally, for, as the conviction must be in due course of law, requiring the intervention of the court and jury, a person might be entitled to the reward by becoming the prosecutor, and, as such, causing the arrest and conducting the case to a conviction; or he might be entitled to it by giving information which would lead to and produce the arrest and conviction of the offender. The instruction was unqualifiedly sustained by the full court. See, also, to the same effect, *Besse* v. *Dyer*, 9 Allen [Mass.], 151 [85 Am. Dec. 747]."

See, also, *Shuey* v. *United States*, 92 U. S. 73. This was a case where the offer of reward was for the apprehension of John H. Surratt, one of Booth's accomplices.

It appears to us that the reward should be paid to the person who was, or persons who were, the original and meritorious cause of the arrest and conviction of the offender; that is, the person or persons who first communicated the information that ultimately led to both. *Fitch* v. *Snedaker*, 38 N. Y. 248 (97 Am. Dec. 791); *Burke* v. *Wells Fargo Co.*, 50 Cal. 218; 24 Am. & Eng. Enc. Law (2d Ed.), p. 956,

and cases cited; 34 Cyc. p. 1746 *et seq.; Kinn* v. *First Nat. Bank,* 118 Wis. 537 (95 N. W. 969, 99 Am. St. Rep. 1012). Some of the authorities make the test depend upon the inducing, or the proximate, cause of the arrest, and turn upon the question whether sufficient information to authorize arrest and subsequent conviction was given, claiming that the facts disclosed must be such as induced the officer to make the arrest.

Bearing in mind that the reward offered here was for the arrest and conviction of the guilty party, there is some difficulty in determining just what was the moving cause of the act of arrest. Of course the confession having followed the arrest, we are not concerned about the conviction. We gather from the testimony of the officer that he would not have made the arrest solely upon the statement of Mrs. McKain, yet he testifies, referring to his talk with Maloney and Kurtz, as follows:

"When I went there I was keen on the scent, and anxious to find out as quick as I could just what the facts were. I lost no time in telling my errand there and asking what they knew."

A careful consideration of the entire record has led us to the conclusion that all three of the defendants may be said to have contributed to the arrest and conviction of Horsman, and that this is a case for the apportionment of the reward. There was concert of action. Manifestly, it was the early statement made by defendant McKain which set the officer at work and led to so speedy a result. It cannot be said that in a sense Mrs. McKain was not the moving cause. We have no doubt, from the testimony, that she referred the officer to Maloney as the true source of information which would justify the result. We cannot speculate and say, as matter of law or fact, that the officer would have obtained this information from Maloney and Kurtz without the intervention of Mrs. McKain. There might have been much delay in

reaching results had not Mrs. McKain given the first information and reference to the source of evidence which led the officer to act. In our judgment, there was such concert of action here as brings this case within the rule of apportionment, under the authorities. Practically, in this case, it appears that it was the information furnished by all of the defendants which led to the result—not a repetition of the same information, but information of independent facts. It was Mrs. McKain who alone referred the officer to defendant Maloney, and he in turn referred to Kurtz as corroborating his statement of the facts which were deemed sufficient to warrant the arrest. It was said by an able English judge that the reward should be divided among such persons as gave information and assistance in proportion to the value of their services. Here each one performed a part in the entire transaction. *Fargo* v. *Arthur*, 43 How. Prac. (N. Y.) 193; *Goldsborough, Adm'r,* v. *Cradie,* 28 Md. 477; *Elkhorn Valley Lodge* v. *Hudson,* 59 Neb. 672 (81 N. W. 859); 24 Am. & Eng. Enc. Law (2d Ed.), p. 959, and cases cited; 34 Cyc. p. 1750.

There seems to be no arbitrary rule for the division of the reward under circumstances like the present. The distribution should be equitable. We deem it equitable and just in this case, and shall so direct that one-half of the reward, now deposited in the court, shall be paid to the appellant, Mrs. McKain, and the remaining one-half to the defendants Kurtz and Maloney. No costs in the court below will be taxed against appellant, and she will be given her costs of this court to be taxed against appellees, and the decree below will be reversed, and one entered here in accordance with this opinion.

STEERE, C. J., and MOORE, MCALVAY, BROOKE, KUHN, OSTRANDER, and BIRD, JJ., concurred.